FRED S. MAILEY, AUGUST MAILEY, INDIVIDUALLY AND AS CO-PARTNERS UNDER THE NAME AND STYLE MAILEY BROTHERS AND EDNA P. MAILEY, WIFE OF FRED S. MAILEY, AND WILLIAM MAILEY AND MRS. WILLIAM MAILEY, DEFENDANTS AND RESPONDENTS.

AUGUST MAILEY, WILLIAM MAILEY AND FRED S. MAILEY D/B/A RANCHERS AND STOCKMEN UNDER THE NAME AND STYLE OF MAILEY BROTHERS, PLAINTIFFS AND RESPONDENTS, *v.* THE BOARD OF COUNTY COMMISSIONERS OF MADISON COUNTY, MONTANA, JOHN E. KRAUSS, T. E. NICHOLLS, RAS HANSEN, AS MEMBERS THEREOF, AND PAUL W. WESTBROOK, FORMER MEMBER OF THE BOARD OF COUNTY COMMISSIONERS, DEFENDANTS AND APPELLANTS.

No. 10428

Submitted January 11, 1963. Decided July 23, 1963.

Rehearing denied September 20, 1963.

385 P.2d 74

Chester L. Jones (argued orally), County Attorney, Frank E. Blair (argued orally), Virginia City, for appellant.

Mark J. Doepker (argued orally), Butte, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from the district court of the fifth judicial district of the State of Montana and the County of Madison involving two cases combined for a hearing at the time of trial. One case No. 5400.1, is an action in condemnation to condemn certain land belonging to respondents, said land comprising 1.77 acres being a right-of-way 60 feet in width connecting up

the private Garden Creek road on the east slope with the Mc-Hessor Creek road on the west slope. The other No. 5404 involves an action by the respondents to close part of an alleged county road running through their property, which portion of said road is the same road hereinafter referred to as having been created by action of the Board of County Commissioners in June 1916. Generally this road ran along the course of Mc-Hessor Creek to the crest of the Ruby Mountains. The cases were heard without jury by District Judge Victor H. Fall who found for the respondent Mailey Brothers in both cases.

Inasmuch as there is a co-mingling of the above referred two cases numbers 5400.1 and 5404, the Mailey Brothers hereafter will be referred to as the respondents and the Board of County Commissioners as the appellants.

The facts controlling the decision revolve around a small mountain creek and canyon located in Madison County. Historically this was a county before Montana became a territory, it having been a county in the Idaho Territory. It was in this locality that Montana's great mineral wealth was first brought to light. Here, too, is located the first two Capitols of the Territory, Bannack and Virginia City, and counsel for the appellants make much of the travails of Montana's early citizens to try to establish a roadway up the creek to the crest of the rugged Ruby Mountains, that divide a portion of the county on its western side. In fact, in appellants' argument, much stress is made that the Indians, probably the Bannacks, used the canyon to go east over the Rubys. However, it is undeniable that McHessor Creek and its canyon would never have become parts of Montana's legal lore had not the Garden Creek Stock Association needed an access road from their spring grazing areas located on the west side of the Ruby Mountains to their summer grazing areas on the east side of the mountains, and had not this creek bed and the canyon been the most direct route.

The respondents, Mailey Brothers, men over 60 years of age,

were born in the area, their parents having settled here long before barbed wire separated private and government land. They were years ahead of the homesteaders who came into this country in the early 1900's, and made open grazing impossible. The brothers, as young men, herded cattle throughout the area now in dispute. In the mid-twenty's, Gus and Fred Mailey took out homesteads along the creek and part of the land homesteaded by Fred lies at the crest of the mountains. It is through this part of the land that the County is trying to condemn a right of way and put a road through to the McHessor Creek Road.

Concerning a certain road up McHessor Creek it is admitted that the road was in existence before the brothers homesteaded. On this point the following questions and answers took place with Mr. William Mailey:

"Q. And is that true as to all the lands through which this McHessor Creek road goes that now belong to your association? A. Oh, no, there is other lands.

"Q. I mean as to this, what's been variously described as four or five miles through which McHessor Creek goes on you, you know what I am talking about, as to that portion thereof, the McHessor Creek road, was that established before or after those lands are patented to your brothers? A. Well, its been brought out here very plainly that the road was there before these boys ever homesteaded it. *That I admit.*" Emphasis supplied.

This testimony taken along with the *de facto* recognition by the Mailey Brothers of the road plus their petition to the Board of County Commissioners to abandon said road as provided by section 32-105, R.C.M. 1947, is sufficient in itself to recognize the existence of the county road to the crest of the mountain on the west slope.

It was brought out by counsel for the appellants that in 1916, in accord with the then prevailing statute, the landowners had petitioned the Board of County Commissioners of

Madison County and after a hearing on June 5, 1916, the County Commissioners had created a county road, said description being in book T of the Commissioners' Journal on page 337, as follows:

"All that portion of said county road southerly from the north line of the south one-half (½) of Section 13, Township 6 South, Range 6 West, M.P.M.; from said one-half (½), section line, through Sections 13 and 24, Township 6 South, Range 6 West and thence southerly through Sections 19, 30, and 31, Township 6 South, Range 5 West, M.P.M.; to the crest of the Ruby Mountains and above said described roadway being and existing generally along the course of McHessor Creek through said above-described lands to the crest of the Ruby Mountains."

A close inspection of the two transcripts and many exhibits involved in this matter, reveals considerable evidence that after the Board of County Commissioners in 1916 created this road on the book nothing was done until the late 1950's. In 1958, there appears to have been a flooding due to a beaver dam and the county paid several hundred dollars for a culvert to be installed in the road to make it passable, but this appears to be the only expense during the 40 plus years that the road was officially in existence as to the records of Madison County. During this same period of time there is undeniable evidence that the road was practically impassable except for horse and wagon, people on horseback, and in these later years jeeps and four-wheel powered wagons of different types. There isn't a scintilla of evidence in the record that you could take an average automobile over the road successfully.

At the time the Maileys homesteaded along the creek at the top of the mountain it was necessary for them to build a road and there is ample evidence that the last part of the road up to the crest, perhaps through some two to four miles was actually built in its entirety by the Mailey brothers for the purpose of servicing their land at the top of the hill and their

holdings along the crest of the Ruby Mountains. The evidence also shows that the road was little used by anyone other than a few stockmen who used the lower road and the Mailey's road to take in salt and supplies to herders and to go from east to west when speed necessitated same. In spite of all the efforts on the part of counsel for the appellants, there is little evidence other than that this was a road used by the stockmen. Counsel tried to establish that the road led to desirable picnic areas, fishing, and recreational areas, but the evidence does not support any such contention. There is some evidence to the effect that hunters use the area in the Fall, and also that at no point up to the time of the late 50's was anyone ever denied the right to cross on this road by the Mailey Brothers.

From 1930 to approximately 1958, the respondents were in peaceful possession of this area and no one gave much thought to just what type of road lay up the McHessor Creek over the Ruby Mountains and down the eastern side. The Garden Creek Stock Association for some years operated on the eastern side of the mountains and in about 1954 was able to purchase certain holdings owned by the Anderson Cattle Company on the west side of the Ruby Mountains. This allowed them to graze early on the west side of the mountains and then to take the cattle to the east side of the mountains for their summer grazing.

The only difficulty in this operation was that unless they could pass through McHessor Creek and up over the Ruby Mountains to their land, approximately a four to five mile trip, it was necessary for them to go around the Ruby Range, back down to their land, a trip that entailed some 35 miles of travel over a graveled area which did considerable damage to the hoofs of the cattle. From the record it would appear that after several such trips the Garden Creek Stock Association decided that they would make the trip up through McHessor Creek and over the Mailey's land, and on June 23, 1958,

the Association drove some 1,000 or more head of cattle over the road trespassing on the Mailey Brother's land.

It must be noted that the road in question, even that portion built by the Mailey Brothers up to the last several miles, was not fenced and anyone who has had any experience with cattle, particularly that many cattle knows that it would have been almost impossible to keep them within the roadway. This instance the cattle ranged fairly wide going through the canyon and over the respondents' lands and, according to everyone concerned, did considerable damage. The appellants state that the damage was only temporary that the grass that was stamped down and eaten by the cattle as they went through would ultimately come back and be just as good as before. The respondents point out that the effects of four hoofs of some 1,000 or more cattle did irreparable damage to their choicest feed spots and that the land did not reproduce the abundant grasses that were there for them before the cattle came through.

As a result of the action taken by the Garden Creek Association in June 1958, the respondent Mailey Brothers posted the road with "no trespass" signs and the commencement of these suits was in the making. It should be noted that even during this time the Mailey Brothers did not forbid stockmen coming up in four-wheeled jeeps or riding through the area, but that their trespass signs were directed to any further efforts on anyone's part to drive cattle over their land and on the county road.

After the posting of the no trespassing signs on the roads, which it is admitted were posted on the Mailey Brothers' property, negotiations commenced through lawyers and efforts were made both by the county attorney, the Garden Creek Stock Association, and the Mailey Brothers to compromise the differences they had concerning a right-of-way between the properties owned by the Garden Creek Stock Association. However, each offer that the Mailey Brothers made concerning

other lands where they felt that the Garden Creek Stock Association could use to go across to their lands, such as McTice Gulch and others, were found to be unsatisfactory for one reason or another, by the Garden Creek Stock Association. As a result of the failure of the hearings it was necessary for both sides to bring legal actions, one a petition to the county commissioners by members of the Garden Creek Stock Association for the opening of a county road all the way from McHessor Creek over the Ruby Mountains and down Garden Creek; the other a petition by Mailey Brothers and other landowners for the abandonment of a portion of the McHessor Creek Road.

As to the first petition the commissioners rejected the request for a public road down Garden Creek, leaving it a private road, but approved, in part, in that they directed action to condemn the short strip of roadway from the McHessor Creek road to the crest of the Ruby Mountains. They also denied the petition for abandonment of the portion of the McHessor Creek road.

Thus, at this point, the situation was that a public road would be established to the crest of the Ruby Mountains up McHessor Creek, stopping at the range lands and private road of the Garden Creek Stock Association.

This determination prompted the two proceedings now here. Cause No. 5400.1 is an action by the county to condemn Mailey Brother's land for the strip mentioned above. Cause No. 5404 is a petition by Mailey Brothers for a writ of certiorari to review the proceedings of the county commissioners in the petition for opening a public road. As to the action refusing to abandon the portion of the McHessor Creek road, Mailey Brothers now assert that it was never a public road, a change of their previous position in requesting abandonment.

In Cause No. 5404, the certiorari matter, the county filed two motions. One, a motion to quash the writ issued and the other, a motion to quash the order to show cause. The grounds

for each were generally that certiorari does not lie to review discretionary determinations of the county board.

On January 30, 1961, after hearing arguments, the county's motions were denied and subsequently the county was ordered to file records of all proceedings involved.

On June 16, the county, after being ordered to do so, filed the return to the writ of certiorari. On that same day, the district judge heard the testimony in Cause No. 5400.1. The record reveals that the court considered both matters, the condemnation in No. 5400.1 and the review of the commissioners' actions in Cause No. 5404, that record being in the form of exhibits containing commissioners' proceedings back to the year 1916, and also a transcript of testimony had before the commissioners concerning the matters previously mentioned.

The district judge of the district was disqualified and Judge Victor H. Fall, Lewis and Clark County, was called in to hear the matter.

It should be noted that Judge Fall went with the interested parties over the McHessor Creek road, all over the Mailey Brother's property observing the road conditions, the width of the McHessor Creek canyon, the length of road that the county is trying to condemn, the road on the east side, the private road of the Garden Creek Stock Association up Garden Creek, and at the end of the hearing he made some interesting observations which he desired should be considered by both parties before making any ruling. He stated:

"Gentlemen, I am not going to undertake to dispose of this case at this moment, but I am going to make a few observations. I am speaking directly to counsel and to their clients. It was almost the general law in this country that when a person owned property that he was not required to fence stock out. The English law, the old English common law, was that you had to—you were entitled to protection but the law in this country used to be, at least pretty generally, that if you wanted to protect your land, you had to put a fence around

your own property. I am frank to tell you, gentlemen, I don't think that is good law today, and I don't think it is the law in Montana. There are two cases on it, one fairly old, one fairly recent. There is a third case which touches on it. And I take the view at least that particularly where the owners of animals have notice in advance that the owners of land do not want them trespassing that you trespass at your peril. I think that is the law of Montana.

"The next thing I want to touch on is this. I agree entirely with the contention of the Garden Creek Cattle Users Association that it is unreasonable to take cattle thirty-five to forty miles or whatever distance they have to take them, and take them down that Spring Creek road to deliver them to their pastures over on Garden Creek, provided they have the situation where they can travel only four miles and get there. * * * and I think a considerable amount of damage would occur to those 750 or 1,000 head or whatever the number of cattle there are. * * *

"On the other hand, Mailey Brothers have got a valuable pasture. I never saw more beautiful clover than I saw along that valley up through there. They have an extremely valuable pasturage, and I think they have a right to be protected in that pasturage. Now I am rather thinking out loud in this thing with the thought that possibly you may be able to effectuate some kind of a settlement between yourselves in this matter. I think there is good faith on the part of both parties here. I don't think Mailey Brothers are just trying to be ornery about this thing, I think they want to protect their pasture and I think the Garden Creek Cattlemen's Association have a perfect right, and I think they are perfectly reasonable when they say they want to get out cattle over the hill just as cheap as we can and we want to get them over there in the best shape we can. * * * So we are confronted with an extremely difficult situation; the rights of the Mailey Brothers compared with the advantages, if you will, of the Garden Creek Cattlemen's

Association. It is unfortunate that this right of way thing wasn't settled before the Garden Creek Company bought the benchland or made investments as they did. It seems to me if I were a member of a group that had a cow herd of some 1,600 head, which I understand is somewhere in that vicinity, owned or controlled 30,000 acres of land, it seems to me that that is a big enough operation to figure out a way to build eight miles of fence and the only way in the world that I can see that you are going to get these cattle through Mailey Brothers is to build a lane through there * * * I will not buy the story for one minute that you can take 750 or 1,000 head of cattle up through that valley of the Mailey Brothers and not just raise Old Whaley with that pasture. * * * That is just too many cattle to take through there without causing appreciable damage in my opinion through that particular valley.

"Now what is the solution? If it is left to me to make an award of damage here to condemn a right-of-way I would have to consider the amount that it would cost to build fences and the evidence is not satisfactory at all yet on that. I would want an additional hearing on that subject and it is not only a question, Gentlemen, of building a fence up there, it is a question of maintaining a fence. Somebodys got to maintain that fence, so that an award, if made, would have to be of sufficient size to build and maintain that fence. * * * Now all of those things enter into an assessment of damages which from my point of view would be quite sizeable and it might be sizeable to the extent that Madison County would want to back away entirely from any idea of establishing any kind of a right-of-way through there. Those things make me think it would be well for counsel and parties here to get together and see if you can't arrive at some kind of a solution between yourselves which would serve both of your interests. * * * I think there is a great deal of merit on both sides, and I think you are each reasonable in your position, but your positions are almost irreconcilable, although there is this solution. I think you could

put a road fence through there, a lane fence, I will call it, with gates regular, stretched long, which could be left open, so that the Mailey Brother's cattle could move back and forth. The gates could always be closed when you push those cattle through. Mailey Brothers are entitled to an assessment of damages for the amount of pasture which they would lose when those cattle went through, because they would sure clean it up if you kept them in the lane. All of those are factors to consider. Now I am going to take these files with me and the exhibits and all these papers, and unless you can figure out some answer to the problem between yourselves, I will undertake to decide it, but I want you to know what I am thinking about too in advance. I would have to have another hearing on this question on the cost of fencing.

"I saw yesterday all of these cattle out there on the bench and I can tell from the looks of it then, the way they were acting, they wanted to get out of there, they want to be over here across the mountains. This is only a suggestion, each side might appoint an arbitrator, and he and a third one go out and look that thing over ahead of time and then afterwards to try to arrive at some kind of a figure for the damages in case you want to move them across now. That is just a thought that I am passing out. * * *

"Now gentlemen, those are my observations made at this time, I'll leave them with you. I am going to take the files and exhibits and all of this stuff with me and I am going back to Helena. I would suggest that the parties take the rest of the afternoon and see if you can't arrive at something. Experience has taught me that litigants can almost always do a better job of resolving their difficulties than the court can, although sometimes they had to do it. Very well, gentlemen, the court stands adjourned."

In spite of Judge Fall's lengthy discussion of the problems that arose through the hearing of the case and his observations of his travels over the disputed land, the litigants could not

come to any agreement and it was necessary for the court to hand down findings of fact and conclusions of law which were in favor of the Mailey Brothers. There were nine separate findings of fact.

"(1) That on the 15th day of November, 1960, the Board of County Commissioners of Madison County, a Body Politic, passed and adopted a certain Resolution which is set forth in Exhibit 'A' which is attached to the complaint in this action.

"(2) That on the 7th day of December, 1960, Fred S. Mailey, August Mailey, and Mailey Brothers by their attorney, M. J. Doepker, gave notice of objection to the resolution of the Board of County Commissioners of Madison County, and notice of objection of Mailey Brothers to the public use of private roads built by Mailey Brothers adjacent to a county road established on or about June 5, 1916, which objections and rejection of a purported award are attached to the complaint and marked exhibit 'B.'

"(3) That the plat of a roadway entitled 'Garden Creek Road' surveyed by Homer G. Bosworth C. E. 8/15/60 exhibits a proposed right-of-way near the crest of the Ruby Mountains and lies entirely between a private road on lands of Mailey Brothers and a private road of Garden Creek Stock Association, and is not connected or joined in any manner or form with an public highway of Madison County, State of Montana, and runs along a roadway now existing in Section 31 T 6 S R 5 W MPM.

"(4) That the plat of the proposed roadway is attached to the complaint in this action and is marked Exhibit 'C'.

"(5) That the use to which said proposed right-of-way is to be applied is not a use authorized by law.

"(6) That the proposed taking of said right-of-way over the lands of Mailey Brothers is unnecessary and that there is no public convenience or desirability for said right-of-way.

"(7) That this action was tried together with Cause No. 5404 of the records of the Clerk of the District Court of the

Fifth Judicial District of the State of Montana, in and for the County of Madison, in an action between August Mailey, William Mailey and Fred S. Mailey doing business as Ranchers and Stockmen under the Name and Style of Mailey Brothers, Plaintiffs and Relators, versus the Board of County Commissioners of Madison County, Montana, John E. Krauss, T. E. Nicholls, Ras Hansen, as Members thereof and Paul W. Westbrook, Former Member of Said Board of County Commissioners, Defendants and Respondents, and the Court *hereby adopts by reference the Findings of Fact and Conclusions of Law made and declared in said cause to the same effect as if the same were incorporated herein word for word and figure for figure and they are hereof made a part.*

"(8) The Court finds generally in favor of the allegations of the answer of the Defendants.

"(9) The Court finds generally in favor of the objections of Mailey Brothers, Fred S. Mailey and August Mailey as set forth in Exhibit 'B' attached to the Complaint in this action."

As to No. 7 above, the findings in Cause No. 5404, the writ of review, canvassed the entire matter of whether (1) there was a public road up McHessor Creek, including going behind the minute entries of the year 1916, and finding too that no continuous use was made by the public from that time on, and generally finding that there was no public road opened and established. The findings also rejected the county commissioners' decision; and, even went so far as to adopt the report of viewers appointed by the county commissioners. In doing so, it is clear that the district judge substituted his views and discretion for that of the county commissioners as appears hereinafter in the trial court's conclusions of law.

The four conclusions of law are as follows:

"(1) That the Resolution of the Board of County Commissioners of Madison County, a copy of which is attached to the complaint marked Exhibit 'A', was void and of no force or effect, and was without and in excess of the jurisdiction of the

said Board of County Commissioners; and said order and resolution of said Board should be and is set aside.

"(2) That the viewers' report subsequent to September 10, 1960, is as follows:

" 'Now this road is very rough and steep in its upper portion and is difficult to travel over, but this road is not intended primarily for automobile travel, but is a road used by stockmen in moving their stock from one range to another, and is very necessary for this purpose.'

which was made the foundation of the Resolution of the Board of County Commissioners dated November 15, 1960, and marked Exhibit 'A' attached to the complaint, discloses a use which is not a public use.

"(3) That there is no public necessity nor convenience for the establishment of said roadway and said roadway and right-of-way is not necessary or desirable.

"(4) That the defendants are entitled to a judgment setting aside the action taken by the Board of County Commissioners aforesaid and to a judgment dismissing these proceedings."

Apellants assign 13 specifications of error in Cause No. 5400.1, that being the case of Madison County v. Mailey on the condemnation and 14 specifications of error in Cause No. 5404, the action of Mailey v. Board of County Commissioners, petition for closing the road running through their property.

These can be posed in the following questions.

1. Was the issue of the original road properly before the court, and did the court err in finding that the road was not legally established?

2. Did the court err in finding that there was no public purpose to be served in the proposed new road?

3. Was certiorari properly employed to review and over-rule the decision of the Board of County Commissioners?

Questions 1 and 3 concern themselves with Cause No. 5404.

Question 2 concerns itself with Cause No. 5400.1, the action

by Madison County to condemn a right-of-way across the lands of the Mailey Brothers to connect up a private road up the east side of the Ruby Mountains with the McHessor Creek road.

As to questions No. 1 and 3 above, the appellant County's specifications of error are argued in its brief at length. Strangely, respondent Mailey Brother's brief is entirely silent concerning the matter. It seemed to be counsel for respondents' position on oral argument that the matter was moot or waived when the two cases were consolidated for trial by the court and when the motions to quash were denied and the County ordered to file its return.

But, these questions have been and are the very heart of the problem. The testimony and consideration given by the trial court so intermingles the two cases that it is difficult to determine just what basis the court had for its conclusions in each . case independently. This statement is made obvious by the trial court's lengthy discussion previously quoted.

R.C.M.1947, § 93-9002, provides in part:

"A writ of review may be granted by the supreme court * * * or by the district court, or any judge thereof, when an inferior tribunal, board, or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board, or officer, and there is no appeal, nor, in the judgment of the court, any plain, speedy, and adequate remedy."

R.C.M.1947, § 93-9008, provides:

"The review upon this writ cannot be extended further than to determine whether the inferior tribunal, board, or other officer has regularly pursued the authority of such tribunal, board, or officer."

In the case of State ex rel. Lay v. District Court, 122 Mont. 61, 68, 198 P.2d 761, this court speaking through Mr. Justice Adair said:

"Certiorari is an extraordinary remedy and the proceeding

under the writ is a special proceeding. State ex rel. Baker v. Second Judicial District Court, 24 Mont. 425, 62 P. 688.

"The power of a court of review to issue a writ of certiorari is limited, secs. 9837 [Rev.Codes 1921, now R.C.M.1947, § 93-9002] and 9843 Rev.Codes [1921, now R.C.M.1947, § 93-9008], and the writ may be granted only when there has been an excess of jurisdiction. State ex rel. King v. Second Judicial District Court, 24 Mont. 494, 498, 62 P. 820; State ex rel. Murphy v. Judge of Second Judicial District Court, 10 Mont. 401, 405, 25 P. 1053.

"By express statute there are three indispensable requisites to the granting of the writ of certiorari, namely: (1) excess of jurisdiction, i. e. that an inferior tribunal, board or officer has exceeded its or his jurisdiction; and (2) absence of the right to appeal from the act, order or judgment assailed as done or made without jurisdiction; and (3) lack of a plain, speedy and adequate remedy other than certiorari. Sec. 9837 [R.C.M.1947, § 93-9002]; State ex rel. King v. Second Judicial District Court, supra. These three essentials must co-exist. 'If there is either an appeal, or a plain, speedy, and adequate remedy, *certiorari* does not lie. If the order or judgment is not appealable, but there is any plain, speedy, and adequate remedy other than *certiorari*, the writ does not lie. The remedy by appeal need not be speedy or adequate.' State ex rel. King v. Second Judicial District Court, supra, 24 Mont. at page 499, 62 P. at page 821; State ex rel. McGrath v. Second Judicial District Court, 82 Mont. 463, 466, 267 P. 803; State ex rel. Johnston v. Second Judicial District Court, 93 Mont. 439, 444, 445, 19 P.2d 220; State ex rel. Haynes v. Sixteenth Judicial District Court, 106 Mont. 578, 81 P.2d 422. If any one of the three essentials enumerated in section 9837, Revised Codes of Montana 1935, [now R.C.M.1947, § 93-9002] is missing the writ may not issue. State ex rel. Mahood v. Board of Railroad Commissioners, 73 Mont. 1, 234 P. 834; State ex rel. Weisz v. Sixteenth Judicial District Court, 61 Mont. 427, 434, 202 P. 387;

522

State ex rel. Grissom v. Justice Court of Township No. 1., Gallatin County, 31 Mont. 258, 263, 78 P. 498; State ex rel. Davis v. Fifth Judicial District Court, 29 Mont. 153, 74 P. 200; State ex rel. Bartol v. Justice of the Peace Court, 102 Mont. 1, 2, 55 P.2d 691. Such is the rule of the common law, the declaration of the statute, sec. 9837, Rev.Codes, [now 93-9002, R.C.M. 1947] and the doctrine of this court. State ex rel. King v. Second Judicial District Court, supra. * * *

"Jurisdiction. Jurisdiction is the power to hear and determine the particular action or proceeding as well as to make such orders and to render such judgment therein as the law authorizes in the class of actions or proceedings to which it belongs. State ex rel. Whiteside v. First Judicial District Court, 24 Mont. 539, 553 63 P. 395. This power necessarily includes the power to decide wrongly as well as rightly, and to make an erroneous order or render an erroneous judgment as well as a correct one. State ex rel. King v. Second Judicial District Court, supra, 24 Mont. at page 497, 62 P. 820. In State ex rel. Whiteside v. First Judicial District Court, supra, 24 Mont. at page 553, 63 P. at page 396, it is said: 'It therefore follows that the conclusion reached and the judgment rendered in the particular case may be either right or wrong, and still jurisdiction be in no wise exceeded (State ex rel. Buck v. Board of Com'rs of Ravalli County, 21 Mont. 469, 54 P. 939); otherwise, the making of an erroneous order or judgment in any case would be in excess of jurisdiction in the sense that it would be the determination of a question *coram non judice.*' "

■ By reason of this authority the motion to quash should have been sustained.

See also Application of Banschbach, 133 Mont. 312, 323 P.2d 1112.

■ On question two we find that matters are so comingled with questions one and three that it is impossible without further hearings, as indicated by the district judge himself, to make determinations on the problem here involved.

We therefore reverse the judgments in both causes. In Cause No. 5404 we order the matter dismissed, and in Cause No. 5400.1 the matter is returned to the district court for new trial on the issues presented by the pleadings.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICE CASTLES concur.

MR. JUSTICE ADAIR, dissenting:

I respectfully dissent to the foregoing majority opinion in the above two causes of action.